9/

Katherine Christensen
Pro Se
1134 W. Grand Caymen Drive
Gilbert, Arizona 85233
tel: 480-813-3885

FILED
2010 FEB -8 AM 9:58
CLERK
U.S. BANKRUPTCY
DISTRICT OF ARIZONA

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA, PHOENIX DIVISION

| | |
|---|---|
| IN RE:<br>Katherine Christensen, Debtor<br>MOVANT<br><br>v.<br>CAPITAL ONE NA; CHEVY CHASE BANK; STEVEN R. HALPIN d/b/a CFO CHEVY CHASE BANK his assigns and/or successors; GARY PERLIN d/b/a CFO CAPITAL ONE NA his assigns and/or successors; SMITH & CRAVEN PLLC; CARSON MESSINGER ELLIOTT LAUGHLIN & RAGAN PLLC; CAL-WESTERN RECONVEYANCE CORPORATION; SUSAN SMOTHERS; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC.; MARY STRATHAM d/b/a NOTARY d/b/a SIGNATORY FOR MORTGAGE ELECTRONIC SYSTEMS INC.; MARTY STRATHAM d/b/a NOTARY d/b/a SIGNATORY FOR CAL-WESTERN RECONVEYANCE CORP.; MARY STRATHAM d/b/a NOTARY FOR CAL-WESTERN RECONVEYANCE CORP.; PAMELA CAMPBELL d/b/a ASSISTANT SECRETARY OF MERS; NORTH AMERICAN TITLE AGENCY OF ARIZONA c/o NORTH AMERICAN TITLE INSURANCE CO.; GILA COUNTY SHERIFF OFFICE, CHRIS MCBREARTY d/b/a MORTGAGE BROKER for CHARTER FUNDING; CHARTER FUNDING; FIRST MAGNUS FINANCIAL; MERENDON MINING; INSTITUTE FOR FINANCIAL LEARNING; JOHN DOES And JANE DOES 1-100, ABC CORPORATIONS 1-100, and XYZ PARTNERSHIPS 1-100, Defendants,<br><br>RESPONDENT | Case No.: 09-21818-RTB<br><br>**DECLARATION OF NEIL FRANKLIN GARFIELD AS EXPERT WITNESS**<br><br>Chapter 7<br><br><br><br><br><br><br><br><br>Assigned to: Hon. Redfield T. Baum |

STATE OF ARIZONA      )
                      )
County of Maricopa    )

Neil Franklin Garfield, deposes and states unsworn under penalty of perjury as follows:

1.  I am over the age of eighteen years and qualified to make this affidavit.

2.  I have been a licensed member in good standing of the Florida Bar FBN 229318 since May 31, 1977.

3.  I am the author and editor of www.livinglies.wordpress.com a blog site on the Internet which contains most of the public records and public domain reports, articles, books, treatises and documentation upon which I rely for my opinion in this case. In addition I have an indirect interest in Foreclosure Defense Group that performs forensic analysis of loan documents, title examinations, analysis of securitization documentation, and prepares Qualified Written Requests, Debt Validation Letters and demand letters for clients, most of whom are attorneys licensed in the jurisdiction in which the subject property is located. Foreclosure Defense Group sponsored the Garfield Continuum Seminars in which I teach laymen and lawyers to understand civil procedure, evidence, motion practice, discovery, ethics, securitization theory and practice, defensive and offensive strategies with servicers, MERS, Trustees, mortgage brokers, "originating lenders," investment bank underwriters, special purpose vehicles and bond issuance. Subjects also include elements of property law, contract law, negotiable instruments, Uniform Commercial Code, tort law and consumer protection under Federal and State enabling legislation.

4.  I have recently testified at deposition as an expert in the class action suit in Case No.: 3:09 cv 180 ECR VPC, United States District Court District of Nevada, to render opinions in the topic areas related to the securitization of mortgage loans, derivative securities, the securities industry; real property law, Uniform Commercial Code practices, predatory lending practices, Truth in Lending Act requirements, loan origination and underwriting, accounting in the context of securitization and REMIC entities, Special Purpose Vehicles, Structured Investment Vehicles, pooling and servicing of securitized loans, assignment and assumption of securitized residential mortgage loans, creation of trusts under deeds of trust, pooling agreements, and issuance of asset backed securities and specifically mortgage backed securities by special purpose vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities, the economics of securitized residential mortgages during the period of 2001- 2008, appraisal fraud and its effect on APR disclosure, usury, exceeding the legal limit for interest charged, non judicial foreclosure of securitized and non securitized residential mortgages, and judicial foreclosure of securitized and non securitized residential mortgages, all particularly as to the laws of the State of Arizona, California, Florida and Ohio, based upon the credentials in the Resume attached hereto.

5. I have no direct or indirect interest in the outcome of the case at Bar for which I am offering my observations, analysis, opinions and testimony. The cost of my preparation, analysis, review, meetings, teleconferences, appearances and all other work is $500 per hour plus all out of pocket expenses all of which must be prepaid regardless of outcome.

6. With respect to the present case Katherine Christensen DEBTOR, I have received and reviewed the closing loan documents and pleadings relating to the loan transactions that are the subject of this lawsuit and I have reviewed the factual results of a forensic review and analysis performed by Foreclosure Defense Group. I have confirmed the information related to me through my review of said closing documentation, as well as my own internet searches with respect to the parties purporting to be the "Lender" in the transaction subject to the instant litigation.

1. I have also reviewed and researched several news articles and pleadings by the U.S. Trustee in connection with the parties making claims as creditors or lenders in the instant case and the apparent connection between the origination of the loan products sold to the debtor and the financial securities products sold to the debtor as part of the same transaction.
2. While the allegations of the U.S. Trustee in the fraudulent mining investment scam alleged have not yet been proven, the information received from the debtor results in an obvious question of fact as to whether the loan origination was fraudulent or predatory on its own, and/or whether the said "loan" was part of a larger securities scheme in which the loan origination was part of a single transaction leading to the so-called "investment" in the securities mining scheme.
3. The two main facts that form the basis of my opinion that there was most likely a fraudulent securities scheme and that the loan originations were part of that scheme are (1) the fact that some of the persons who solicited the financial loan product were physically present and participated in the solicitation of the fraudulent mining investment and (2) that the funds were wired direct from the closing table at the loan originations to the a mining company that may or may not have been the issuer of the fraudulent securities.
4. Based upon my extensive experience, research and training in securities, mortgage origination and securities fraud, it is my opinion that it is far more likely than not that undisclosed commission, rebates or kickbacks were paid from one or more participants in the fraudulent mining scheme to the originator or people representing the originator of the financial loan products.
5. Since my conclusion is that such payments were made, and the HUD settlement statements do not disclose the payments or the relationships of the parties, such payments and such arrangements would be patent violations of the Truth in Lending Act and regulation Z, the amount of which is a liability from the originator to the debtor.

7.      My opinions are based upon public records and documentation written or prepared by the purported originating party that is designated as a "lender" in the contracts and deed executed by the homeowner in this case, as well as the documentation that in my opinion was relevant to the securitization of the financial product sold to the homeowner as a residential home loan and simultaneously or contemporaneously sold as a financial product to an investor. In my opinion, both financial products were securities, neither set of securities were properly registered or regulated, and the information that would reveal the identity(ies) of the "Lender" is in the sole care, custody and control of the loan servicer or another intermediary conduit in the securitization chain, including but not limited to the Trustee or depositor for the Special Purpose Vehicle that re-issued the homeowner's note and encumbrance as a derivative hybrid debt instrument (bond) and equity instrument (ownership of percentage share of a pool of assets, of which the subject loan was one such asset in said pool).

7.1.    According to information from Debtor, Debtor has made unsuccessful attempts through industry standard letters requesting the identity of the lender, the documentation authenticating the identity of the lender, and an accounting from the lender as to all money paid or received in connection with the subject obligation.

7.2.    At such time that the Defendants comply with the requests for said information, I will be able to identify with certainty the current creditor (the true owner of the alleged obligation). In such event the identity of the creditor(s) and the opportunity to obtain a full accounting will be present.

1. I use the following definition of "creditor" taken from research in cases, statutes and the Uniform Commercial Code. In my own words, a "creditor" is a legal entity that has advanced funds, goods or services in the expectation of being paid.
2. In the context of securitized residential mortgages (including the one in the instant case), a "creditor" is a legal entity or group of entities or persons under the law who have advanced money for the funding of mortgage loans and who are owed money from those mortgage loans.
3. The creditor in the case at bar can be generically described as an investor (as defined under the rules and regulations of the Securities and Exchange Commission) who has paid money to an intermediary in a chain of securitization that resulted in the funding of one or more residential loan transactions; the promise to pay is from an entity usually referred to as a Special Purpose Vehicle (SPV) which is frequently erroneously referred to as a "Trust" with a "Trustee."
4. The creditor/investor receives an instrument which is generically referred to as a mortgage backed asset certificate. The certificate incorporates terms by which the promise to pay interest and principal is made by the issuing SPV. The promise to pay is conditioned upon several terms, including but not limited to the performance of a pool of loans, the obligations of third parties, and impliedly the receipt of insurance proceeds

Case 2:09-bk-21818-RTB    Doc 83    Filed 02/08/10    Entered 02/08/10 20:40:11    Desc
Main Document    Page 4 of 9

02/08/2010

triggered by partial non-performance of the pool of assets allocated to the SPV.
5. In turn the SPV pool is carved out of other pools created by aggregators employed by investment banking firms.
6. The aggregators are parties to Pooling and Service agreements and Assignment and Assumption Agreements that generally predate the funding of the loans in any of the pools. The certificate issued to the investor conveys a percentage interest in the pool of assets that is allocated to the SPV.
    a. However, in practice, the specific assets, most often residential mortgage loans, may or may not have been accepted into the SPV pool and may be time-barred or barred by other terms, such as the requirement that the chain of assignments in the securitization be recorded or be in recordable form.

7.3.  Until such time that the identity of the creditor(s) and the precise money and document trail is disclosed in the securitization of the current transactions in the case at bar, I must rely upon internet searches making certain presumptions regarding the subject loan transactions.

1. On the issue of default of the OBLIGATION: The obligation is the amount of money owed to the creditor. The obligation originated with the advance of capital by investors who purchased mortgage-backed securities and ended with the promise to pay by the homeowner who is the debtor in the transaction. The securitization chain obscures the fact that the investor was the lender/creditor and the homeowner was the borrower/debtor.

2. The issue of "default" is also obscured (i.e. a question of fact, as to whether any obligation ever arose, considering the fact that the debtor received virtually no consideration for the transaction and may well be said to have been in a far worse position upon execution of the originated documents that immediately before. This issue is accentuated by the fact that the property in question was unencumbered before these transactions were originated and hence constituted equity to the extent of their real value at the time of the consummation of the alleged loan transactions.

3. Defendant's assertion of a default is based upon partial and insufficient information relating only to first party (debtor) payments and excluding many undisclosed third party payments and receipts that were obscured in the securitization chain. Contrary to the Defendant's assertion of default it is my opinion that it is much more likely than not that the <u>debtor's obligation</u> has NOT been in default at any time and even if in default it is highly unlikely that any party or entity is at risk of loss.

4. The general practices of the industry during the period of time in which the subject transactions were originated resulted in third party payments upon a

declaration of default by a party without knowledge of the entire accounting of all debits and credits. This triggered insurance-type payments to the investment bank that originated the securitization chain that more likely than not exceeded the total principal of the subject obligation, resulting in a liability of the investment bank to the debtor, the creditor or both. Since the investment bank never advanced funds except those delivered by or on behalf of investors, neither the investment bank nor any other participant in the securitization chain was ever a creditor.

5. Further, based upon repeated interactions with servicers across the country and the specific documentation reviewed in this case, it is highly unlikely that any of the current parties in litigation have or desire to have any knowledge of third party debit or credit transactions in the securitization chain of the transactions originated from the subject of this action. Hence, based upon industry practice, it is my opinion that it is far more likely than not that they would be ignorant of the true status of the amount of principal or interest due, if any on the subject obligation. It is not known by the servicer or originator whether the Debtor's note is or ever was in default - a fact that can only be known by the real Creditor/LENDER(s).

6. Based upon industry practice, my personal review of hundreds of similar transactions including the one at bar, and published reports, in my opinion, there is a very high probability that all or part of the Debtor's obligation was paid in whole or in part by third parties to the creditor or to parties purporting to represent the creditor and who had apparent authority to do so.

7. It is also my opinion that many different parties in the securitization chain came to express title or claim rights to enforce the mortgage and note and that the intention to split the note from the mortgage while heretofore unusual in the marketplace was commonplace in securitization of residential loans.

8. Hence, it is my opinion, that the holder of the note, either singular or plural, are not the same parties as those who purportedly hold the mortgage and that this was a result that was intended by the mortgage originator and the parties to the securitization chain, since it was a typical practice in the investment banking industry in their process of securitizing loans throughout the period of 2001-2009.

9. As relates to the various Motions to Lift Stay, my opinion is offered as follows:
    1) That the Movant is not the party whose own funds are at risk in the outcome of the litigation.
    2) That Movant presented a statement without knowledge of its truth or falsity in its motion when it made the following statements: "By virtue of the Note and Deed of Trust, Movant has a secured interest in the property described herein and a secured claim against Debtors." 4. "Debtors are in default on the obligation to Movant. . ." 5. "Debtor s are indebted for the principal balance plus accruing interest, costs, and attorneys fees."

1. The fact that the both the mining company that originated the securities scheme and the "loan" originator that solicited the debtor are in bankruptcy is indicative and make it far more likely than not that the loan originator was NOT a lender and was actually acting as a straw man mortgage "broker" (unlicensed, according to my research) formed specifically to solicit such mortgage applications and create the misleading impression that they were lenders who were functioning within the usual underwriting standards promulgated under various rules and regulations governing banks, lenders and associations of banks or lenders.
2. The servicer is a fee-based company providing strictly clerical functions without any knowledge or interaction in connection with origination of the loan transaction, payments by anyone or to anyone between the time of closing and the time the servicer began servicing the account, nor any payments received or made by any parties other than the debtor, despite the servicer's knowledge that third party payments were being made by counterparties, insurance, and Federal bailout.

3) Movant's presentation of documents, implying that the chain of ownership of the note went from Lender, to Movant or any parties associated with Movant is misleading with the likelihood that they had full knowledge that such presentation was misleading. Numerous parties acting in the alleged capacity of Movant have been the subject of numerous reports and court orders in which they had misrepresented themselves and the facts and in particular misrepresented their authority to service, enforce, collect or foreclose on any part of the debt or collateral.

4) Movant's presentation of documentation to the Court regarding the chain of securitization therefore appears to be false on its face and false in view of a pattern of conduct in which documentation was either fabricated or falsely presented to courts in various jurisdictions.

5) Movant's failure to name and prove the identity of all parties that do have a financial interest in the note presents the undersigned with a fact pattern that makes it impossible to determine the status of the obligation, the status of the note and the status of the security instrument. Considering the fact that affiant is aware of many dozens of times in which this has occurred it is my opinion that this behavior is intentional and designed to obscure the facts long enough for the court to presume that the action taken to collect on the debt or foreclose on the collateral was reasonable and proper.

6) Neither Affiant nor Movant will be able to determine amount of Debtor's equity in the property until a complete accounting of all debits and credits including but not limited to the 3rd party payments referred to above.
7.3.5. It also appears that the standard industry practice of creating a yield spread premium between the lender and originator was extended and expanded in the case of the securitization chain such that in this case, in my opinion, it is highly probable far beyond 50% probability that the Debtor's loan was sold or pre-sold to the investors at a

gross profit to the participants in the securitization chain of at least 35% of the total principal balance of the note. Under the Truth in Lending Act, Regulation Z, and the Real estate Settlement Procedures Act, these undisclosed yield spread premiums are a liability of participants in the securitization chain, including the loan originator and any other party to the securitization transactions owed to the homeowner/debtor.

1. In my opinion the investors were and remain completely unaware that much, and in many cases, most of the money they supplied was used to fund fees for the participants in the securitization chain, with the rest used to fund bloated mortgage loans based upon inflated appraisals by companies that had a less than arm's length relationship.
2. In my opinion, this disclosure does not appear on any of the plaintiff's documents identifying the parties participating in fee-splitting or yield spread premiums nor the amounts involved as required by the Truth in Lending Act and the Real Estate Settlement and Procedures Act. Further, no information appears in Debtor's closing documentation that would have caused him to inquire about such a premium, which exceed any yield spread premium ever paid prior to the securitization of residential mortgages.
3. In my opinion, it is equally probable that the investors were kept unaware that only 2/3 of their investment was actually going to fund Debtor's loan and other similarly situated. Based upon direct conversation with Debtor, she also was unaware that such large profits or premiums were being generated by virtue of her identity.
4. My opinions are also based upon substantial knowledge, training, experience, study and analysis of securities, securities regulation, securitization, derivatives and various precursor asset protection or bankruptcy remote schemes in commercial and real estate settings.

9. My opinions are also based upon direct interaction via telephone, email or written correspondence with many intermediary conduits and some underwriters of the reissued securities to investors who bought mortgage-backed securities.

10. My opinions are based upon certain assumptions regarding securitization of the subject loan which can only be verified by review and analysis of the actual securitization documents, applicable credit default swaps or other insurance or hedge products, and audit, review and analysis of the effect, if any of federal bailout money received by the Lender (i.e., the party who actually advanced the funds from which the subject obligation was funded) or any parties who received such funding or money relating to or arising from the subject homeowner obligation created by the financial loan product sold to the homeowner in this instance.

11. I express these opinions that are offered within a reasonable degree of factual certainty and financial probability based upon filings with the Securities and Exchange Commission, prior knowledge of intermediary/conduit parties in the subject transactions, and the known participants, in this loan and its securitization

12. I have also reviewed, for the past 40 years, published Financial Accounting Standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known participants in the securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transactions were posted on or off the books of the larger originating entity. These entries adopted by said companies constitute admissions that the transaction was not considered a loan receivable on its balance sheet (or on the ledgers used to prepare the balance sheet) but rather shown on the income statement as a fee for service as a conduit. These admissions in my opinion are fatal to any assertion by any such party currently seeking to enforce mortgages in their own name on their own behalf, including but not limited to the securitization participant in this case.

13. In my opinion, with a high degree of certainty, the Debtor's title was and is subject to a cloud on title, a claim of unmarketable title and possibly a title defect that cannot be cured without court order as a result of the manner in which Debtor's loan was securitized. In all cases reviewed by me, which include more than fifty securitization chains, the Prospectus and other published documents clearly express that a securitized mortgage is treated sometimes as being secured by real estate, and sometimes as not being secured by real estate, depending on the context and purpose of the accounting. The naming of a party other than the Lender as beneficiary under the Mortgage Deed as distinct from a third party named as Payee on the promissory note and the same or other third party named as beneficiary under the policy of title insurance demonstrates an intent or presumption or reasonable conclusion that there was intent by some or all of the parties at various times in the steps of the securitization process to separate the Note from the Deed of Trust, thus creating a cloud on title for both the owner of the property and any party seeking to express or claim an interest in the real property by virtue of the encumbrance.

FURTHER, AFFIANT SAYETH NAUGHT.


Signed on February 5, 2010



/s/ Neil Franklin Garfield, Esq.